IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 14, 2015 Session


**IN RE WESLEY P.**


**Appeal from the Chancery Court for Weakley County**
**No. 22470     W. Michael Maloan, Chancellor**


_____


**No. W2014-02246-COA-R3-PT – Filed May 29, 2015**
_____


The trial court terminated the parental rights of both mother and father on the ground of severe abuse. Because there is sufficient evidence to conclude that mother and father were engaged in methamphetamine manufacture in their home, we affirm the finding of severe abuse. However, because no clear and convincing evidence exists in the record that termination is in the child's best interest, we reverse the termination of both mother's and father's parental rights.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Carol S. Godwin, Martin, Tennessee, for the appellant, Stephanie C.P.

Beth Farmer-Belew, Paris, Tennessee, for the appellant, Kenneth P.[1]

Herbert H. Slatery, III, Attorney General and Reporter; and Jason I. Coleman, Assistant

_____

[1] Father filed a brief in this case, but did not participate at oral argument.

Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## Background

Appellants/Respondents Stephanie C.P. ("Mother") and Kenneth P.[2] ("Father," and together with Mother, "Parents") are the parents of one minor child, born in 2006. At the time of the child's birth, Parents were not married.[3] In 2011, Petitioner/Respondent State of Tennessee Department of Children's Services ("DCS") removed the child and his half-sister[4] from Parents because the children were residing in a structure where methamphetamine was being manufactured. When the child first came into DCS custody, the child and Parents resided in Weakley County. On October 4, 2011, the trial court entered an agreed order finding that the child was dependent and neglected and severely abused due to the manufacture of methamphetamine in the home. The children were placed with relatives, but Parents maintained supervised visitation. On May 22, 2012, the juvenile court entered an order restoring custody of both children to Parents. The order provided that it constituted a final disposition of the matter.

At some point in early 2013, DCS received a referral indicating that Parents were again manufacturing methamphetamine in their home. On February 14, 2013, a DCS caseworker, Kandi Sawyers, and an officer with the Carroll County Sherriff's Office, Joel Pate, arrived at Parents' home in Carroll County to investigate the allegations. Officer Pate found numerous items associated with the manufacture of methamphetamine. Ms. Sawyer subsequently administered a urine drug test on Mother, who tested positive for methamphetamines and amphetamines. Father was not present during the inspection of the home or the drug screening. Mother was arrested and taken into custody on February 14, 2013. Because Father was out of town, as discussed in detail *infra*, the child was temporarily placed in the custody of paternal grandmother. Father eventually moved in with paternal grandmother and the child. The parties participated in a child and family team meeting on February 19, 2013. At this meeting, Father submitted to a urine drug screen and tested

---

[2] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[3] Parents married during the pendency of this case in the trial court.

[4] The child's half-sister is not at issue in this appeal.

2

negative for all substances. Both Parents agreed to participate in services with DCS, and the child was returned to Father, with Mother allowed only supervised visitation with the child.

Mother and the child participated in a hair follicle drug test in March 2013; both tested positive for methamphetamines. Mother subsequently entered into an inpatient drug rehabilitation facility on April 15, 2013. There is some dispute as to whether Father was required to participate in a hair follicle drug test; regardless, Father did not participate in such a test at this time. DCS eventually removed the child from the home at midnight on May 31, 2013. Parents were permitted to have supervised and therapeutic visitation with the child. Father was also not prohibited from attending the child's sporting events.

Father was later arrested in June 2013 on charges of child abuse for allowing the child to be exposed to methamphetamine. Father eventually pleaded no contest to the charge of reckless endangerment. Father was sentenced to eleven months, twenty-nine days of supervised probation. Mother pleaded guilty to attempted aggravated child neglect, promotion of methamphetamine, and misdemeanor theft[5] as a result of the February 14, 2013 home visit. Mother was sentenced to twelve months in jail and several years of supervised probation. As part of Mother's sentence, however, she agreed to undergo one year of inpatient drug rehabilitation in lieu of incarceration.

### Juvenile Court Proceedings

On April 29, 2013, DCS filed a petition in the Weakley County Juvenile Court to transfer legal custody of the child to DCS. The petition alleged that while it remained in the child's best interest to live with his parents, Parents agreed to abide by a non-custodial permanency plan, which had been created at the February 19, 2013 meeting. The plan required that Mother complete an alcohol and drug assessment, that Mother submit to future drug screenings, that the family participate in Wolfe Counseling Services and follow all recommendations, that the child have a hair follicle drug screening, and that Parents would ensure that the child is appropriately administered his medication. Finally, the petition asked that Mother only be allowed supervised visitation with the child. Notably, the petition did not request that Father be required to submit to random drug screens. Approximately one month later, on May 31, 2013, DCS filed an amended petition alleging that Parents refused to comply with the agreed-upon plan.[6] Due to the alleged non-compliance, DCS asked that the

---

[5] During the February 13, 2014 home visit, law enforcement also discovered evidence that Mother had broken into storage units.

[6] The amended petition alleged no facts surrounding Parents' alleged failure to follow DCS's requirements.

child be removed from Parents' custody and that custody be awarded to DCS. On the same day, May 31, 2013, the Weakley County Juvenile Court entered an ex parte order of protection placing the child in DCS's custody. The juvenile court entered an order appointing Mother and Father counsel on July 9, 2013. On July 23, 2013, the juvenile court entered an order maintaining temporary custody of the child with DCS.

On September 5, 2013, Parents entered an agreed order moving the child to a different kinship foster home, the home of Father's brother and his wife. The order stated that "the parties are working toward reunification of the minor child and his parents." However, the order was not signed by counsel for DCS, nor did the order contain a certificate of service indicating that a copy of the order was sent to DCS. As such, on September 17, 2013, DCS filed a petition to vacate the September 5, 2013 order, asserting that DCS was not consulted prior to the entry of the agreed order. The juvenile court entered an order on November 19, 2013, maintaining the child in the kinship foster home and approving a June 30, 2013 permanency plan. According to the juvenile court's order, the plan's stated goal was "Exit Custody to Live with Relatives." The parties participated in further legal proceedings in the Weakley County Juvenile Court regarding the placement of the child. The child was subsequently removed from Father's brother's home and placed in a foster home.[7] Eventually, on March 11, 2014, the juvenile court ratified a new permanency plan that included the goal of adoption. Both Parents objected to the new plan. The trial court's order notes that this plan was developed on December 9, 2014. From the record, it appears that this was the most recent permanency plan ratified prior to the termination of Parents' parental rights.

### Chancery Court Proceedings

While the above proceedings were taking place in the Weakley County Juvenile Court, DCS filed a petition to terminate Mother's and Father's rights to the child on July 19, 2013, in the Chancery Court of Weakley County. The petition alleged a single ground for termination: severe abuse. Parents, however, contend that they were not informed of DCS's intention to terminate their rights until months later, approximately around the time that the final permanency plan was ratified.

Father filed a response to the petition on February 6, 2014, denying the material allegations contained therein. On February 25, 2014, Mother filed her own response to the

---

[7] According to the record, the child was removed because Father's brother and his wife had failed to take required CPR classes.

4

petition. In addition to denying the material allegations regarding severe abuse and the child's best interest, Mother denied that Weakley County was an appropriate venue. On February 28, 2014, Mother filed a motion to dismiss the petition on the basis of improper venue. No order was ever entered on this motion. Instead, a trial on the termination petition occurred on September 18, 2014.

Officer Pate, a member of the Carroll County Drug Task Force trained in recognizing the evidence of methamphetamine use and manufacture, testified about the investigation into Parents' home. When Officer Pate and Ms. Sawyers arrived, a man answered the door. The man was later revealed to be an unrelated friend of Parents. Both Ms. Sawyers and Officer Pate testified that they could hear discussion prior to the door opening. When they asked for Father, the man replied that he would get him. The man returned and indicated that Father must not be home. As this time, Officer Pate noticed that a back door to the home was ajar. Soon thereafter, Mother arrived home with the child and gave written consent for Officer Pate to search the home. Officer Pate testified that he found substantial evidence that methamphetamine manufacture was taking place at the home during his investigation, including a glass pipe used for smoking methamphetamine, an empty bottle of sulfuric acid, and fifteen empty twenty-ounce bottles, typically used in the "shake-and-bake" method of methamphetamine manufacture. Officer Pate also testified that he found two methamphetamine labs on the property, and various other items that were typically used to manufacture or use methamphetamine.

DCS caseworker Ms. Sawyers also testified. Ms. Sawyers testified that, after receiving a referral that Parents were exposing their children to illegal drugs, she went to Parents' home with Officer Pate to investigate. After Mother arrived at the home, she agreed to submit to a urine drug screening. According to Ms. Sawyers, Mother's drug screening revealed that she had used methamphetamine. Ms. Sawyers testified that Mother admitted to having used methamphetamine four days prior to the drug test. Ms. Sawyers also testified that she later administered a hair follicle test to Mother and the child in March 2013, both of whom tested positive for methamphetamine. Ms. Sawyers further testified that she informed Father that he too was required to submit to a hair follicle test, but that Father avoided being tested during her time on the case. Ms. Sawyers testified that, after the child was returned to Father, Father refused to keep in contact with DCS or to update DCS as to the child's whereabouts even though Mother and Father agreed to participate in non-custodial services with DCS. Ms. Sawyers testified that she eventually was required to consult law enforcement to find Father. According to Ms. Sawyers, Father's failure to keep in contact with DCS led to the filing of the petition for custody in the Weakley County Juvenile Court and the petition to terminate Parents' parental rights in the Weakley County Chancery Court. In addition, Ms. Sawyers explained that Father's refusal to maintain contact with DCS was the catalyst for the

midnight removal of the child on May 31, 2013. Ms. Sawyers admitted, however, that the child was always in school during this time.

Mother testified that she first began using drugs, mostly marijuana, in 2004. After that time, Mother was sober for six years before relapsing in 2011. Mother admitted that she used methamphetamine in the days leading up to February 14, 2013. Mother contended, however, that she never used methamphetamine in the parties' home or around the child. Further, while Mother admitted that she and Father had engaged in the manufacture of methamphetamine in 2011,[8] prior the child's first removal, Mother denied that the parties were engaged in methamphetamine manufacture in February 2013. However, Mother stated that Father's prior method of methamphetamine manufacture employed the "shake-and-bake" method, which required the use of twenty-ounce bottles. Mother further testified that the child must have been exposed to methamphetamine due to a couch that the child slept on nightly, at a friend's house, or through his ADHD medication.

Mother testified that although she had previously attended an in-patient drug rehabilitation center in 2011, she left the center without the tools to allow her to avoid drug use. Accordingly, Mother relapsed into drug abuse approximately eight months after entering that program. In contrast, Mother testified that she would soon complete one-year court-ordered stay in a drug rehabilitation center, where she learned the appropriate coping mechanisms to remain drug-free. There was no dispute that Mother was not using any drugs at the time of trial and that she had met all requirements with regard to her plea agreement and drug rehabilitation program. At the time of trial, Mother was working at a Jackson, Tennessee, area restaurant and also helping others with addiction problems at Pathways, a drug rehabilitation center. Mother testified that, although she was not allowed to have children where she currently lived, she would graduate from her current program in November 2014. At that time, Mother had options that would allow her to parent her child full-time.

A licensed clinical social worker at Pathways, Tajauna Miller, testified that she works closely with Mother at Pathways. Although Ms. Miller is not Mother's counselor, Ms. Miller testified that she works alongside Mother with other drug users and that she is familiar with Mother's efforts to remain drug-free. Ms. Miller testified that those who participate in a program like the one followed by Mother have high chances of remaining drug-free. Both Mother and Ms. Miller acknowledged, however, that there was no guarantee that Mother

---

[8] Mother testified that Father was the party actually engaged in making methamphetamine in 2011, as their source of income at that time. Mother testified, however, that because she was aware of Father's conduct, she was equally culpable.

would remain drug-free.

Mother further testified that she participated in all therapeutic visitations with the child that were offered by DCS. In addition, when allowed by her drug rehabilitation program, she attended any visitation or sporting events that she was able. Mother testified that she and the child have a close bond and that the child often inquired as to whether he could return home. All DCS workers and counselors that testified supported Mother's testimony that she participated in all allowable visitation, that the visitation was healthy for the child, that Mother appropriately parented the child during the visitation, and that the child exhibited a close bond with Mother.

Finally, Mother admitted that in addition the charges related to her drug use and misdemeanor theft in February 2013, she also pleaded guilty to burglary and felony theft in November 2013. According to documents in the record, this offense occurred on July 13, 2013. Mother admitted that she committed these crimes. Mother agreed to serve a total of four years of supervised probation for these crimes. Father was later convicted of burglary and theft charges arising from the same incident. Both Mother and Father maintained that Father took no part in the crimes, but was merely convicted because Mother was driving Father's car. Father's appeal of his conviction was pending at the time of trial. Mother remains on probation for these charges. It is unclear from the record whether Father was sentenced to any jail time as a result of these convictions.

Father likewise denied that the parties were engaged in the manufacture of methamphetamine in February 2013. Father admitted that, while he engaged in manufacturing methamphetamine in 2011, he did not abuse the drug at that time or at any time prior to the removal of the child. Instead, he testified that he only used marijuana at that time. Father further testified that he was unaware that Mother was abusing drugs in February 2013. Father also indicated his belief that the child's positive methamphetamine test was the result of sleeping on a couch that had previously been located in a known methamphetamine lab.

Father testified that, on February 14, 2013, he was in Kentucky performing a job. Father testified that he was unable to return immediately upon learning of Mother's arrest because he was required to complete the job. Father further testified that he saw no reason to return to Carroll County and forego his pay, as the child was initially placed with paternal grandmother.

Father also denied that DCS ever required him to undergo a hair follicle drug screening. According to Father, after he passed his initial urine drug screening, DCS either

did not require a hair follicle test or refused to pay for one to be administered. Because DCS would not pay for the hair follicle test, Father testified that he was under the impression that one was not required. Father did submit to a hair follicle test approximately three weeks prior to trial, which was positive for methamphetamine. Father explained that he regretted his action, but that it was an isolated incident that would not be repeated.

Father admitted at trial that he was currently on probation in Kentucky, where in 2010 he pleaded guilty to possession of a controlled substance, methamphetamine, for an incident that occurred in 2006. Less than a year after Father was placed on probation, the child was removed from the home due to allegations of methamphetamine manufacture. Father further testified that he is also on probation in Tennessee with regard to the reckless endangerment charge that occurred as a result of the child's positive hair follicle test in 2013. Father also admitted that he was arrested in March 2014 for driving on a revoked license, which is the most recent of three times Father was arrested for such offense. Finally, Father admitted that he had been convicted of burglary and theft in May 2014 but, like Mother, denied that he had any involvement in that crime.

Father testified that he changed jobs to be home more for the child after Mother was arrested. Father further testified that he maintains steady employment and that he financially contributes to the child's well-being by providing sports equipment for the child and other items. Father further testified that he participated in all required therapeutic visitation with the child, that he attends all of the child's sporting events and extracurricular activities, and that he and the child maintain a very close relationship. All counselors and DCS workers that testified confirmed that, other than Father's recent failed drug screening, after the child was removed from the home, Father complied with all requirements of DCS, attended all scheduled visitation, and had a healthy, close, and loving relationship with the child.

DCS entered the deposition testimony of Dr. Lisa Piercey as an evidentiary exhibit. Dr. Piercey is Vice President of West Tennessee Healthcare and serves as the medical director of the Madison County Child Advocacy Center. Dr. Piercey testified that the child's positive drug screening could only occur if the child had inhaled or ingested something that was contaminated with methamphetamine. She stated that the positive drug screening could not have been the result of any prescription medicine that the child was taking. Dr. Piercey further testified that a research study showed that methamphetamine residue only remains in a home for forty-eight to seventy-two hours after manufacturing or use ceases. Dr. Piercey admitted, however, that there was no data as to whether that window of time could increase due to repeated and substantial exposure to methamphetamine manufacture over a long period of time. The doctor further testified to the significant and prolonged effects in the child due to the exposure to methamphetamine. According to Dr. Piercey, a child exposed to

methamphetamine could have short-term effects, such as an immediate negative physical reaction to the exposure, mid-term effects, like withdrawal, or long-term effects, which often will not materialize for years after exposure. Although Dr. Piercey observed no short-term or mid-term negative effects on the child, she testified that it was too early to definitively determine whether the child would suffer from long-term effects from the exposure. These long-term effects can include neurological impairment, developmental delay, mental retardation, cerebral palsy, behavioral abnormalities, and problems with attention span and mood. Further, the doctor testified that the manufacture of methamphetamines has significant safety risks, which can include fire, explosion, or acute inhalation injury.

A DCS caseworker, Julia Haynes, testified that she repeatedly requested that Father take a urine drug screen, but that he only acquiesced on her fourth attempt, three weeks prior to trial. Ms. Haynes admitted, however, that DCS informed Father that they would be unwilling to pay for any drug screens. Ms. Haynes testified that Father agreed to those terms, but subsequently refused to make himself available for the drug screens. Ms. Haynes also testified that the child is doing well in his foster home, and that the foster family is willing to adopt the child. According to Ms. Haynes, the child has a strong bond with foster parents, and he feels safe in their care.

At the conclusion of the trial, the trial court orally ruled that the ground of severe abuse had been proven as to both Parents. The trial court also ruled that it was in the child's best interest that Father's parental rights be terminated. The trial court, however, took the issue of whether the child's best interest supported termination of Mother's rights under advisement. The parties were given the opportunity to file post-trial briefs on that issue. On September 26, 2013, DCS filed a Memorandum in Support of a finding that termination of Mother's parental rights would be in the child's best interest. Mother filed a memorandum in opposition on September 29, 2013. Ultimately, the trial court entered an order terminating both Parents' rights on October 22, 2014, based upon a finding of severe abuse. In its order, the trial court determined that it was in the child's best interest that both Parents' rights be terminated. Parents filed timely notices of appeal.

## Analysis

### Venue

Mother first argues that the trial court erred in implicitly denying her motion to dismiss the termination petition on the basis of improper venue.[9] For most civil cases, venue

___

[9] Father does not raise venue as an issue on appeal, nor did he object to venue in the trial court.

in transitory actions is proper in the county in which the cause of action arose or in the county where the defendant resides or is found. *See* Tenn. Code Ann. § 20-4-101(a). However, the Tennessee General Assembly may enact different venue provisions for specific causes of action, and it has exercised this power with regard to proceedings to terminate parental rights. Venue in a termination preceding is, therefore, governed by Tennessee Code Annotated Section 36-1-114, which states:

> The termination or adoption petition may be filed in the county:
>
> (1) Where the petitioners reside;
> (2) Where the child resides;
> (3) Where the child resided when:
>
> (A) The child became subject to the care and control of a public or private child-caring or child-placing agency; or
> (B) The child became subject to partial or complete guardianship or co-guardianship pursuant to a surrender proceeding as provided in this part; or
> (4) In which is located any licensed child-placing agency or institution operated under the laws of this state having custody or guardianship of the child or to which the child has been surrendered as provided in this part.

In this case, it is undisputed that neither Parents nor the child resided in Weakley County at the time of the filing of the termination petition. In addition, the DCS caseworker that initially filed the petition worked in Carroll County at all times relevant to this case. DCS argues, however, that venue was proper in Weakley County pursuant to subsection (3)(A), as Weakley County was where the child resided when he and his half-sister were first subject to DCS Custody in April 2011.

A "child caring agency" is "any agency authorized by law to care for children outside their own homes for twenty-four (24) hours per day." There appears to be no dispute that DCS qualifies as a child caring agency as it relates to this case. Here, the child resided in Weakley County at the time he first became subject to the care and control of DCS. There is nothing in the statute or in any caselaw provided to this Court by Mother that suggests that Tennessee Code Annotated Section 36-1-114(3)(A) is limited to the child's residence immediately preceding the removal of the child. Clearly, Tennessee Code Annotated Section 36-1-114(3)(A)'s use of the past tense indicates that the residency of the child may be determined using a prior residence of the child, so long as the child resided there when he or

10

she became subject to the care or control of a child-caring agency. Indeed, this Court in examining the predecessor to this venue statute, indicated that the General Assembly's purpose in creating a venue statute particular to termination proceedings was to "tip[] the venue scales in favor of [DCS] and against the biological parents." *In re B.N.S.*, No. M2003-02524-COA-R3-PT, 2004 WL 892535, at *2 (Tenn. Ct. App. April 26, 2004). Under these circumstances, we cannot conclude that venue was improperly established in Weakley County.

## Termination of Parental Rights

We next consider whether the trial court erred in terminating Mother's and Father's parental rights on the ground of severe abuse. Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tenn. R. App. P. 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The clear and

convincing evidence standard defies precise definition, *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989), but has been described as a "high evidentiary burden." *In re Alex B.T.*, No. W2011-00511-COA-R3PT, 2011 WL 5549757, at *9 (Tenn. Ct. App. Nov. 15, 2011); *see also In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005) (explaining the need for the "heightened" standard of proof as due to the stakes of a termination proceeding being "so profoundly high"); *Gates v. Williams*, No. E2010-01192-COA-R3-CV, 2011 WL 683935, at *3 (Tenn. Ct. App. Feb. 28, 2011) (describing the clear and convincing standard as a "high burden"). It is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*.

Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *In re Jacobe*, 434 S.W.3d at 568; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *Morrison v. Allen*, 33 8 S. W.35 417, 426 (Tenn. 2011).

### Ground for Termination

Here, DCS sought to terminate Mother's and Father's parental rights on a single ground: severe abuse. On appeal, only Mother argues that the trial court erred in finding that this ground had been met. Accordingly, we will only consider whether there is clear and convincing evidence to establish the ground of severe abuse as it relates to Mother in this case.

Tennessee Code Annotated Section 36-1-113(g)(4) provides for the initiation of parental termination proceedings, in relevant part, as follows:

12

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights ... to have committed severe child abuse against the child who is the subject of the petition . . . .

In turn, Tennessee Code Annotated Section 37-1-102(b)(21) defines severe child abuse as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury[10] or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

&ast; &ast; &ast;

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

&ast; &ast; &ast;

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine . . . is occurring; . . . .

The trial court found that both Parents were guilty of severe abuse, stating:

[T]he Court concludes and finds that grounds for Termination of Parental Rights do exist against [Mother and Father] by clear and convincing evidence, based on severe abuse of the minor as defined in T.C.A. §37-1-102(b)(21), because the parents stipulated to said severe abuse on September 13, 2011, and in

_____

[10] Serious bodily injury "includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Tenn. Code Ann. 39-15-402(d).

13

2013 the minor child again ingested methamphetamine while in the care of the parents, while the mother was using methamphetamine and the child was in a structure where the process of manufacturing methamphetamine was occurring. Mr. and Mrs. Phillips are responsible for said severe abuse.

Here, it was undisputed that Mother and Father previously engaged in methamphetamine production in their home when the child was originally removed in April 2011. In addition, it is also undisputed that both Mother and Father agreed that this behavior constituted severe abuse and that the juvenile court entered an order finding the child dependent and neglected due to severe abuse on October 4, 2011. After that finding, however, the juvenile court, apparently believing that the issues in Parents' home had been remedied, returned the child to Parents. Nearly a year passed before there was another referral for DCS to investigate.

Upon investigation in February 2013, DCS and law enforcement concluded that Parents were again manufacturing methamphetamine in their home. The trial court concluded that clear and convincing evidence confirmed DCS's conclusion. From the record, we agree. Here, Officer Pate testified that he observed several hallmarks of methamphetamine production in Parents' home in February 2013, including sulfuric acid, a multitude of twenty-ounce bottles, and other items. Due to these items and Officer Pate's training and experience, Officer Pate concluded that Parents were again manufacturing methamphetamine in their home. In addition, Mother tested positive for methamphetamine at that time and admitted to methamphetamine use. Shortly thereafter, the child also tested positive for methamphetamine. According to Dr. Piercey, the child's positive drug test was the result of recent exposure to methamphetamine.

Both Mother and Father, however, consistently denied that they were engaged in methamphetamine production in February 2011. Parents offered various explanations for the child's methamphetamine exposure. In addition, Parents blamed the existence of the implements used to manufacture methamphetamine on third-parties or denied that the items were used in methamphetamine manufacture. The trial court, however, found that Parents simply were not credible on this issue. As previously discussed, a trial court's credibility findings will be given great weight on appeal. *See **In re Jacobe***, 434 S.W.3d at 568. From our review of the record, we conclude that Officer Pate was clearly qualified to opine as to whether the items found in Parents' home was used in methamphetamine manufacture. Under these circumstances, his testimony is entitled to great weight from this Court. In addition, Dr. Piercey explained that the child's positive drug screening was likely the result of having recently been exposed to the use or manufacture of methamphetamine  Based on this evidence, the trial court determined that Mother and Father were again manufacturing

methamphetamine in their home in February 2013. Given the trial court's credibility findings, and the great weight of the evidence presented, we conclude that the evidence does not preponderate against this finding. Because severe child abuse includes "[k]nowingly allowing a child to be present within a structure where the act of creating methamphetamine . . . is occurring," we conclude that clear and convincing evidence exists to establish the ground of severe abuse. Tenn. Code Ann. § 37-1-102(b)(21)(D).

### Best Interest

Before a court in this State can terminate a biological parent's parental rights, it must also find that doing so is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then "the interests of parent and child diverge." *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, "Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated § 36-1-113i provides a list of factors the trial court is to consider when determining if termination is in the child's best interest:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or

15

another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court, however, is not limited to these factors. Tenn. Code Ann. § 36-1-113(i). The best interests of a child must be determined from the child's perspective and not the parents. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). As with the ground for termination, the party who seeks termination bears the burden of proving by clear and convincing evidence that termination of the parental rights of each parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c).

In this case, both Parents argue that the trial court erred in concluding that termination of their parental rights was in the child's best interests. The trial court concluded that it was in the child's best interest that both Parents' rights be severed based upon the factors outlined in Tennessee Code Annotated Section 36-1-113(i). In its written order, the trial court explained:

> Some factors favor termination while other factors support denial of termination. The following factors support denial of termination. There is no dispute that [P]arents have a meaningful relationship with the child and they visit the child on a regular basis. There is no evidence that a change in caregivers and physical environment is likely to have an adverse effect on [the child]. There is no evidence regarding [P]arents' mental or emotional status. [Father] has provided for the child in the form of paying extracurricular fees and providing items for the extracurricular activities.
>
> The factors that weigh in favor of termination are the

following and they heavily outweigh the factors in favor of denial of termination and they are the following. [Father] used methamphetamine as recently as August of 2014, just weeks prior to the hearing in this matter. [Mother] has made adjustments to her circumstances of conduct in that she has been drug free since the child was removed from the home in May of 2013 but she has yet to maintain sobriety outside of a protective environment. There is concern that the testimony of both parents is that they are undecided whether to live together in light of the father's recent methamphetamine use.

It is unclear if the mother effected a lasting adjustment in her circumstances in light of the foregoing factors contributing to the child's removal and the child'' subsequent positive drug screens for methamphetamine. Both parents severely abused the child on two separate occasions and the uncertainty that the mother and father may continue to do so in the future is of great concern. [Mother] lives in a controlled environment due to her rehabilitation. [Father] is awaiting sentencing on burglary charges that are related to the charges the mother pled guilty to and he is on probation in Kentucky and Tennessee. Again, the Court is concerned about whether any future home will be safe and healthy in light of [P]arents' past performance. The record supports the conclusion [P]arents are unable to care for [the child] in a safe and stable manner. Neither parent has paid child support according to the child support guidelines.

When all the statutory factors are evaluated the Court finds by clear and convincing evidence that termination is in the best interest of the minor child.

The trial court clearly struggled with this question, referring to the issue as "troubling" in its oral ruling. Moreover, with regard to Mother, the trial court appeared even less certain, describing the issue as "even more challenging" and directing the parties to complete additional briefing on this issue prior to rendering a final ruling. Although we will discuss the relevant factors with regard to both Parents, we consider this issue individually as to each Parent.

Not unlike the trial court, this Court has also struggled with this issue. However, because the applicable factors do not reveal a clear picture in favor of a finding that termination is in the child's best interest, we must reach a different conclusion than that of

17

the trial court. Several factors weigh in favor of a finding that neither Mother's nor Father's rights should be terminated. First, we note that it is undisputed that Mother and Father enjoy a close and meaningful relationship with the child. *See* Tenn. Code Ann. § 36-1-113(i)(4). Testimony from counselors shows that Parents' relationship with the child is loving and healthy. The record also shows that Parents have maintained regular visitation with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3). There is no dispute that Father attends regular visitation with the child and also attends the child's sporting events. Father often visits with the child approximately three times per week. The evidence also shows that Mother attended all visitation with the child that she was able to attend, even while she was being treated at a residential rehabilitation facility. There was also no testimony that visitation between Parents and this child was ever disruptive or harmful for the child. Further, nothing in the record indicates that either Mother's or Father's mental or emotional statuses prevents them from effectively parenting the child. *See* Tenn. Code Ann. § 36-1-113(I)(6). Indeed, although we do not discount the seriousness of the child's exposure to methamphetamine, we note that there is no other evidence in the record to suggest that the child was not well-cared for prior to his removal. Finally, unlike in many parental termination cases, it appears from the record that the child would not be harmed by a change in caretakers or physical environment; although testimony indicates that the child had done well in his foster parents' home, the child knows Mother and Father as his parents and has frequently and consistently expressed his desire to return to their care. *See* Tenn. Code Ann. § 36-1-113(i)(5).

Some factors are less clear. First, there is no dispute that neither Mother nor Father has paid child support in accordance with the child support guidelines while the child has been removed from their care. *See* Tenn. Code Ann. § 36-1-113(i)(9). Parents testified, however, that they provided the child with in-kind support during this time, including sporting equipment and other items. The question of the physical environment of each Parent's home was also uncertain. Although Parents were married at the time of trial, they were living apart due to Mother's drug treatment. *See* Tenn. Code Ann. § 36-1-113(i)(7). Mother was somewhat unable to testify as to the physical environment of any future home she may have with the child, as she was currently living in a home that did not allow her children to reside with her. *See* Tenn. Code Ann. § 36-1-113(i)(7). Mother testified that she was unsure whether Parents would reside together when her treatment was completed. Nothing in the record indicated that Father's current home was physically unsuitable for the child; however, Father's drug use so close to the trial on the return of his son certainly does not convince this Court that the home will be free of "criminal activity" or the "use of . . . controlled substances . . . as may render the parent or guardian consistently unable to care for the child in a safe and stable manner," especially given the fact that the child was removed from the home due to the use and manufacture of methamphetamine. ***Id.*** In addition, both Parents have a history of criminal conduct. In fact, both Parents pleaded guilty

18

or were convicted of criminal acts that occurred after the removal of the child. Finally, the trial court found, and this Court has affirmed, that the manufacture of methamphetamine in the home constituted severe abuse of the child. Consequently, we must conclude that both Parents have been found to have shown neglect toward the child. *See* Tenn. Code Ann. § 36-1-113(i)(6). Accordingly, these factors militate in favor of a finding that termination of both Parents' rights is in the child's best interests.

Two factors remain: (1) "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;" and (2) "[w]hether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(1) & (2). Both of these factors focus on whether Parents have remedied the conditions that led to the removal of the child so that the child can be returned to their care. In this case, Mother's drug use and the manufacture of methamphetamine in the home were the main catalysts for the removal of the child. The evidence was undisputed that Mother has been sober since the removal of the child. Her sobriety, however, has been reinforced by the fact that she has been residing in a controlled environment. Indeed, it was undisputed that Mother had previously completed a thirty-day course of drug rehabilitation, but returned to abusing methamphetamine in approximately eight months. In addition, Mother admitted at trial that she could not resume full-time care of the child until after her course of treatment was completed. The trial court found these facts highly relevant as to the question of whether Mother had made a lasting adjustment in circumstances and conduct so as to make it safe for the child to return to her care in the future. Mother argues on appeal that the trial court erred in focusing on her inability to predict the future, where there was considerable evidence that Mother's sobriety was a lasting adjustment in circumstances, including the fact that Mother is far more involved in her rehabilitation program than before, she has been sober longer, and her co-worker testified that those who are as committed to a rehabilitation program as Mother is have good chances of remaining sober. Accordingly, Mother argues that she has done everything possible to redeem her previous poor behavior.

Nearly the opposite is true of Father. While there was no direct evidence that Father was abusing methamphetamine at the time of the child's removal,[11] Father has admittedly abused methamphetamine in the child's absence. Indeed, even with the permanent cessation

---

[11] That is not to say that Father was not involved in the manufacture of methamphetamine in February 2013. The trial court found that Father was engaged in the manufacture of methamphetamine at this time and Father has not raised this finding as an error on appeal.

of the relationship with his son on the horizon, Father chose to use illegal drugs mere weeks before the trial on the termination petition. Because of Father's recent drug use, the trial court concluded that he had also not made a lasting adjustment of circumstances and that it could be unsafe to return the child to his care. Father argues on appeal, however, that the court should not allow his "one time mistake" to outweigh the multiple factors that weigh in favor of a finding that the child's best interests would not be served by terminating Father's parental rights.

In this case, there is no dispute that Parents have previously engaged in behavior that put the child in substantial risk of harm. Indeed, the fact that the child had not yet suffered physical effects from Parents' methamphetamine use and manufacture at the time of the removal can only be attributed to sheer chance. As previously discussed, however, the burden remains on DCS to prove by clear and convincing evidence that termination of both Parents' parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). Here, all of the evidence presented in the record indicates that Mother has made every effort to change her circumstances to allow her to maintain a relationship with the child. We cannot conclude that Mother's inability to guarantee that she will remain sober is clear and convincing evidence sufficient to support a finding that the child's best interests would be better served by terminating his relationship with Mother at this juncture.

However, due to Mother's uncertain living arrangements and Father's recent drug use, we agree with the trial court that it is uncertain whether the child could have been safely reintegrated into Parents' homes at the time of trial. We note, however, that "[d]espite the harm that results to a child from the parent being unavailable to care for him, in a given instance, that harm may be outweighed by the benefit to the child of continuing the parental relationship." *In re Adoption of J.K.W.*, No. E2006-00906-COA-R3-PT, 2007 WL 161048, at *8 (Tenn. Ct. App. Jan. 23, 2007), perm. app. denied (Tenn. 2007). Furthermore, as explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

20

Here, the record indicates that both Parents have a significant relationship with the child and that the child would likely be harmed by the severance of the relationship. This Court has previously held that "the development of a 'relationship,' without more, is an insufficient basis to support a finding that it is not in the best interest of [the minor child] to terminate his parents' parental rights" when the evidence established that the child could never be returned to the care of his parents during his minority. *State of Tennessee Dep't of Children's Servs. v. D.G.B. and C.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at \*10 (Tenn. Ct. App. Sept. 10, 2002) (involving parents whose mental incompetence meant that they would "never" have the ability to care for a child). In this case, however, there is no suggestion in the record that the child will never be able to be returned to the care of either parent. In fact, other than Parents' involvement with illegal drugs, nothing in the record indicates that Parents ever failed to meet the child's needs with regard to shelter, food, or medical care. Furthermore, Parents have made significant, though not perfect, efforts to remedy the conditions that led to the child's removal and have endeavored to support and visit the child consistently since he was removed from their care. Often, the best interest element of a termination of parental rights case turns on a delicate balance between the substantial need to provide the child stability and the interest of the child in maintaining a relationship with his or her biological family. Considering the totality of the evidence both in favor and against termination of Parents' parental rights, we must conclude that DCS failed to "eliminate[] any serious or substantial doubt" in this Court that the termination of either Parents' parental rights is in the child's best interests. *In re M.J.B.*, 140 S.W.3d at 653. Because a finding that termination is in the child's best interest is necessary to terminate a parent's parental rights, we must reverse the termination of both Mother's and Father's parental rights.

## Conclusion

The judgment of the Chancery Court of Weakley County is affirmed as to the finding that a ground exists to terminate the Appellants' parental rights, but reversed as to the finding that termination is in the child's best interest. Consequently, the termination of the parental rights of Stephanie C. P. and Kenneth P. to their child, Wesley P., is reversed. Costs of this appeal are taxed to Appellee State of Tennessee Department of Children's Services, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

21